Summers, J.
On April 22, 1896, an act was passed, commonly known as the Rogers law, entitled “An act to amend and supplement Sections 2505a and 2505& of the Revised Statutes of Ohio, as enacted May 1, 1891, and amended April 18, 1892” (92 O. L., 277). This act provided for the consolidation of street railroad corporations, and that a company organized for street railroad purposes might purchase or lease street railroads, and that whenever it was proposed to bring any two or more lines of road within the control or ownership of one corporation or company under the provisions of the act, “which roads are held and operated under grants providing different terms and conditions,” it shall be competent for the city to extend the term of each of said grants or franchises, provided the company should agree “to such changes and modifications in the existing terms and conditions of said grants or franchises, including motive power, extensions, changes and revision of routes, and including also the above-mentioned rates of fare for children, and transfer system, and such other changes as to rates of fare and transfers as will make the terms and conditions applicable to all said roads or lines satisfactory to áaid boards of administration or legislative body.”
*200 On August 13, 1896, the board of administration of Cincinnati passed a resolution, entitled “A resolution granting an extension of time -to the Cincinnati Street Railway Company for the various lines of road, routes and franchises owned by it, and brought under its control and ownership by uniting its lines of road, routes and franchises with the lines of road, routes and franchises of the Mt. Adams & Eden Park Inclined Railway and the Mt. Auburn Cable Railway, under the provisions of the act of the General Assembly of Ohio, passed April 22, 1896, commonly known as the ‘Rogers Law,’ and entitled ‘An act to amend and supplement Sections 2505a and 2505& of the Revised Statutes of Ohio, as enacted May 1, 1891, and amended April 18, 1892,’ and revising the terms and conditions of all said grants and franchises.”
The scope of the resolution is sufficiently indicated by its title. The resolution was accepted by the company and thereby was established a street railway system comprising thirty-four distinct routes and by the terms of the resolution the company was required to give to its passengers, who have paid fare at the cash rates, transfers to its various routes.
The Cincinnati Traction Company, as lessee of the Cincinnati Street Railway Company, operates the system.
The Rapid Railway Company is an interurban street railway company organized for the purpose of constructing and operating an interurban street railroad from Lebanon, Warren county, to the city of Cincinnati. The Cincinnati & Eastern Railway Company is an interurban street railway *201 company organized for the purpose of constructing and operating an interurban street railway from Richmond in Clermont county to the city of Cincinnati.
These two interurban street railway companies were subsequently consolidated under the name of The Interurban Railway & Terminal Company. Prior to the consolidation, in March, 1902, each of these companies entered into a traffic arrangement or agreement with the Cincinnati Traction Company, for the purpose of enabling each of said companies to .enter into the city of Cincinnati and to reach its station or depot on Sycamore street between Fourth and Fifth streets.
The Interurban Company refused to give to its passengers transfers to the cars of the urban road and refused to accept transfers given by' the urban company to its passengers good upon the cars of that company passing OArer routes which are in part traversed by the cars of the Interurban Company.
In September, 1903, the city of Cincinnati, by its solicitor, coriimenced an action in the superior court of that city against these street railway companies to obtain the giving and acceptance of such transfers.
The petition contains the following averments and prayer:
“Plaintiff further' says that by Adrtue of certain traffic agreements entered into by the Cincinnati Traction Company with the Cincinnati & Eastern Railway Company and the Rapid Railway Company and the assignment or lease thereof of such rights by said Rapid Raihvay Company and said *202 Cincinnati & Eastern Railway Company to the Interurban Railway & Terminal Company, said Interurban Railwáy & Terminal -Company, defendants herein, is operating a line of traction cars carrying passengers and freight from its depot on Sycamore street, between Fourth and Fifth streets, and New Richmond, Ohio, using and occupying by virtue of such traffic arrangements from the east corporation line of Cincinnati to said depot, the said East End route, or a substantial part of said East End route and its extensions, using said East End route and .tracks thereof from its depot eastwardly to a point about five miles therefrom.
“Said Interurban Railway & Terminal Company, defendant herein, is also operating a line of traction cars from said depot to a point in Warren county, Ohio, and by virtue of said traffic arrangement above mentioned and the assignment or lease thereof in the city of Cincinnati, is using almost all the length of the tracks of the Walnut Hills Cable route and a small portion of those of the Mb Auburn Cable route, using all the tracks of said Walnut Hills Cable route from the loop to the corner of Court and Broadway and the extension of said route from Court and Broadway to Court and Sycamore, a total length of about three miles, and thence from said Sycamore and Court using the tracks of the Mt. Auburn Cable route from Court and Sycamore to the depot above mentioned on Sycamore street. *
“Plaintiff further says that said Cincinnati Traction Company gives to its passengers paying a five-cent (5c) fare upon the cars of said traction *203 companies transfers as provided in said resolution and said the Interurban Railway & Terminal Company refuse to accept in payment of fares of passengers upon its cars transfers issued by said the Cincinnati Traction Company, which transfers except for the alleged difference in ownership of the cars would, by the terms of said resolution, be good for passage over the routes traversed by said cars of the Interurban Railway & Terminal Company, and said the Interurban Railway & Terminal Company in the running of its cars over said Walnut Hills Cable route, East End route and Mt. Auburn Cable route refuse to give passengers paying a cash fare of five cents the transfers provided in said resolution of August 13, 1896, to be given to passengers upon cars operated over said routes, claiming that the difference in ownership of said cars, to-wit; That said cars are owned by the Interurban Railway & Terminal Company and not by the Cincinnati Traction Company exempts said company from so accepting and giving transfers.
“Wherefore, plaintiff prays that said defendants be required to specifically perform the conditions of said resolution of August 13, 1896, in the giving and acceptance of transfers upon any and all of the cars of any of said companies running-over the tracks of the routes herein set forth, and over any route described in said resolution of August 13, 1896, or any extension of said routes without regard to the ownership of said cars so run, and that said defendants and each of them be enjoined from operating or running any cars over any of said routes described herein and in said resolution, or any parts of said routes or *204 extensions thereof without complying with the terms of said resolution in the matter of giving and accepting transfers, and for all other and proper relief.”
The defendants each filed demurrers.. The special term of the superior court reserved the cause for the decision of the court in general term-. The general term overruled the demurrers, and, having refused leave to the defendants to file answers, which it was of opinion did not state a good defense, it decreed that:
“It is therefore considered and decreed that said defendants perform the conditions of said resolur tion of August 13, 1896, set forth in the petition, in the giving and acceptance of transfers upon any and all of the cars of said companies- running over the tracks of the routes set forth in the petition, and over any route described in said resolution or any extension of said routes without regard to whether said cars so run are owned by one or the other of said defendants, and that said defendants provide, within the corporate limits of the city of Cincinnati, a system for transferring passengers from line to line going in the same general direction without regard to by which of said defendants the cars operated over said lines may be owned or operated, and further, that said transfers provided for in said resolution- of August 13, 1896, and set forth' in the petition, be given and accepted by the defendants in the operation of the cars over said lines, without regard to 'by which of said defendants said cars are so operated are owned.
*205 “And it is further ordered that, upon the failure of the defendants for ninety days to so transfer passengers or ■ to so give and accept transfers, as herein provided, said defendants be enjoined from operating or running any cars over any of said routes or extensions thereof, and be further enjoined from charging any passenger, within the limits of the city of Cincinnati, a greater fare than five cents for a continuous ride in the same general direction oyer any of the lines of the defendant without regard to by which of said defendants said cars may be owned or operated.”
The resolution of August 13, 1896, provides that the company “shall be required to operate each of said routes by runnings cars continuously (or by transfers) in each direction between both termini,” and shall issue and accept transfers over its various routes.
The reasonable construction of this resolution would be that the grantee is required to issue and accept transfers good on the cars it uses in operating these routes, so that in the absence of anything more the obligation sought to be imposed would not be apparent. However, the contention is that the obligation arises under the statutes by virtue of which the companies were authorized to contract.
On May 17, 1894,' was passed an act entitled “An act to authorize and regulate electric railroads” (91 O. L., 285; Sections 3443-8 to 13, inclusive, Revised Statutes). It authorized the construction of street railroads upon the highways outside of municipalities. Section 4 is as follows: “Such companies shall have power to *206 lease, purchase or make traffic arrangements with any other street railroad company as to so much of its tracks and other property as may be necessary or desirable to enable them to enter or pass through any city or village, upon the same terms and conditions applicable to other street railroads. And any existing street railroad company owning or operating a street railroad shall receive the cars, freight, packagés or passengers of any other road, upon the same terms and conditions • as they carry for the general public.”
On May 21, 1894, was passed an act entitled “An act to supplement Section 2505 of the Revised Statutes of Ohio as heretofore supplemented by enacting Section 2505c.” 91 O. L., 379.
This act provided that whenever any railway company is organized for the purpose of building or accjuiring a railroad from one municipality or point to another municipality or point in the state, it and any street railway company owning a street railway in any such municipal corporation shall have “authority to make an arrangement or agreement with any street railway company or companies owning or operating any street railway or railways in any such municipal corporation or corporations, and said street railway company or companies shall haAre authority to make and enter into such arrangement or agreement with said railway company, whereby the passenger cars of such railway company may be run and propelled over and along the track or tracks of such railway company or companies, for such compensation and upon such terms as may be agreed upon in the same manner, upon the same conditions and for' the same length of time as the *207 cars owned or operated by said street railway company or companies are operated in such municipal corporation or corporations.”
This agreement was required to be with the consent of two-thirds of the stockholders of each company, and it was provided that in case it used only the tracks of an existing street railway in any city that it would not be necessary for it to obtain any grant in addition to such agreement. And “provided, further, that the fare charged by street railway companies for transporting passengers within the municipal corporation or municipal corporations, shall not be greater than that fixed in the franchise or franchises held or owned by such street railway company or companies.”
The contention of counsel for the railroad companies is, that the interurban companies were organized under the first act, and that only Section 4 of that act applies, while the contention of counsel for the city is that both acts apply.
The occasion for both of these acts is not apparent, but they do not necessarily conflict. It may be that the one or the other applies accordingly as recourse has been had to its authority. However, if the latter act applies, there is nothing in it requiring transfers. The provision is that the fare charged for transporting passengers in the municipality shall not be greater than that fixed in the franchise of the street railway company. This is a limitation upon the fare the interurban company may charge for the service it is authorized to render and not a requirement that it shall provide or pay for additional transportation.
*208 The giving of transfers is of recent origin and is the outgrowth of consolidation. It did not originate with legislation and had not been recognized in our statutes at the time of the passage of this act and not until the act of May 17, 1894.
Recurring to that act, the reasoning of the superior court is to the effect that the agreement is a lease and that therefore the lessee is bound by the terms of the resolution as to transfers. Without stopping to consider the soundness of this conclusion, it may be observed that the averments of the answers, which it was proposed to file, do not imply a lease and that the allegations of the petition do not support the conclusion that the interurban roads are lessees. The allegations of the petition are, that the interurban company is operating a line of cars from its depot in the city to New Richmond and to a point in Warren county and that in doing so it uses certain of the tracks of the defendant in the city.
Assuming that Section 4 authorizes an urban company to agree with an interurban company that the latter may use the tracks of the former providing they exchange transfers, there is no suggestion, in the absence of a lease, of any principle upon which a court may import such a stipulation into the contract and then decree its enforcement. It would seem that the extent of its power would be to enjoin the interurban company from using the tracks in the city until it had obtained the right to do so upon the terms prescribed by statute.
However, the principal contention is as to the meaning of Section 4 of the act of May 17, 1894, and since the case may be disposed of on its *209 merits by the proper interpretation of that section, that question will now be noticed.
• Section 4 provides that interurban street railroad companies shall have power to lease, purchase, or make traffic arrangements with a municipal street railroad company as to so much of its tracks and other property as may be necessary or desirable to enable them to enter or pass into any city or village, upon the same terms and conditions applicable to other street railroads.
These companies have made an agreement that the interurban roads shall run their cars into the city to their station over certain of the tracks of the urban road, and the question is whether the stipulation in the contract between the urban road and the city as to transfers is one of the terms and conditions subject to which the urban and interurban companies are authorized to make such agreement'.
The words “terms and conditions” appear in many, if not all, of the statutes delegating to municipalities the authority to grant to street railroads the right to use the streets, and perhaps in all ordinances making the grant, and yet it can not be said that they are used with a definite legal signification. The first general law in this state relating to street railroads was passed April 10, 1861, entitled: “An act to provide for and regulate street railroad companies” (58 O. L., 66). It contains the words “terms and conditions,” but street railroad companies for a number of years prior, thereto had been organized under the laws authorizing the organization of railroad companies, and street railroads had been constructed and operated thereunder for a *210 number of years, and many of the provisions of the law are the outgrowth of the business. The act of 1861 provided that no grant to occupy a street in Cincinnati should be made excepting in accordance with Sections 15 and 16 of an act passed in i860. Section 15 of the act of i860 (57 O. L., 16) provides that the city council shall not thereafter permit a street railroad to be constructed in the streets without the consent of a majority in interest of the owners of property upon the street. Section 16 is as follows: “Section 16. The said city council shall prescribe by ordinance the manner and the terms and conditions upon which the streets and avenues of said city may be used or occupied by street railroads, and the proper authority to grant permission for such purpose. But no such grants shall be made until public notice of the intention to make the same, and inviting proposals therefor, at a specified time and place, shall be published for ten days in one or more of the principal newspapers of said city; nor shall such grants be made except to such person or persons or company as will agree to carry passengers upon said railroad at the lowest rates of fare, and all reductions of the rates of fare shall inure to the benefit of the passengers carried.”
Section 17 of the act provided that Sections 15 and 16 should not be held to prevent the construction, extension or use of any street railroad which had already been in part constructed, or for which an agreement had already been made.
Turning to page 720 of the Laws and General Ordinances of the City of Cincinnati, published in 1866, we find an ordinance passed July 1, 1859, *211 entitled “An ordinance prescribing the terms and conditions of street passenger railroads within the city of Cincinnati.” An examination of the ordinance discloses that most, if not all, of the provisions of the general street railroad law thereafter in 1861 enacted are copied from or evidently suggested by this ordinance. It provides that no track shall be laid without the consent of the city council, designates the companies or individuals to whom the privileges are granted and the streets through which said lines shall run, the gauge of the track, the kind of rail, the manner in which it shall be laid, how the streets shall be repaired, the kind of cars, how often they shall run, and other provisions not necessary to notice; and Section 14 prescribes twelve separate and distinct regulations.
Sections 7, 8, 13 and 15 of the ordinance are as follows:
“Section VII. [Advertisement to be made for bids.] Provided that the city auditor shall, when instructed by the city council, advertise for ten days in the official papers of this city, stating the routes which have been designated by council for street railroads, and ask for sealed proposals under this ordinance, to construct .the same, and the company or individual that will pay the highest amount of license per car per annum, and the highest amount for each passenger carried, and also to bid for the lowest price of commutation tickets, in packages of not less than twenty-five, shall be considered the successful bidder; provided, however, the city council shall be the judges of the bids.”
*212 “Section VIII. [Not more than ñve cents to be charged for fare.] And provided any such company or individual shall not charge more than five cents for each passenger, on any of said roads.”
“Section XIII. [Track may be used by other companies.] The city council shall, at any future time, have the power, when the public good demands, to grant a second or third company or individual the right to occupy any track already laid down, provided the expense of laying and keeping in repair of said track, so far as used by different companies or individuals, shall be equally-borne by all those that use them; but the council shall not have the right to, grant permit to run upon any route already disposed of, for a greater distance than one-tenth of the whole route.”
“Section XV. This ordinance shall continue and be in force from and after its passage. All contracts made under the provisions of this ordinance shall be for the term and period of twenty years.”
Turning to page 732 of the same volume, it will be observed that on July 13, 1859, the council adopted five- routes over many -streets, and on pages 733 and 734/ that on July 28, 1859, route No. 1 was granted to Rufus King and others, and that on July 29, 1859, routes 2, 4 and 5 were granted to other individuals, and to the Cincinnati Street Railroad Company.
This ordinance of 1859 prescribed the terms and conditions of street railroads in the city generally, not of particular routes or grants. Section 16 of the act of i860 directs that the city *213 council shall prescribe by ordinance the manner and the terms and conditions upon which the streets and avenues of a city may be used and occupied by street railroads. The ordinance limited the maximum fare to five cents, but, subject to that limitation, the fare that might be charged by the grantees was to be determined by bids.
Section 16 of. the act of i860 required the city council of the city of Cincinnati to give notice and invite proposals, and the general stteet railway act of 1861 was amended in 1866 (63 O. L., 55), by an act that required all municipalities to do so. And such ever since has been the requirement of the statutes. Section 4 of the act of May 17, 1894, provides that the agreement may be made upon the same terms and conditions applicable to other street railroads. Not upon the terms and conditions of the grant to the company owning the tracks, but upon the terms and conditions applicable to street railroads generally. So that, while the rate of fare to be charged by a street railway may be made one of the terms of the grant to it of the right to occupy the streets, it .could not be one of the terms and conditions applicable to street railroads generally.
If this conclusion is correct, then the question is answered, but a few other important considerations may be mentioned. At the time of the enactment of Section 4, in 1894, the construction of interurban roads was in its inception. Since then the business has developed wonderfully. Millions of dollars have been and are being invested, and these roads are relieving the congested condition of the cities and working im *214 portant changes in the mode of life. That the Legislature recognized in them a public benefit and purposed to encourage their' construction is evidenced by the statute, and a construction that manifestly will tend to defeat that purpose ought not to be given to the statute unless plainly required.
It is averred in the answer of the interurban roads, and judicial notice might be taken that such would be the fact, that “the enforcement of a transfer system within the limits of Cincinnati, between the cars of the Cincinnati Traction Company and these defendants, would result in filling the cars of these defendants with urban and municipal passengers of the city of Cincinnati, to the exclusion of the interurban passengers going beyond Cincinnati, and would require these defendants, which were organized for the purpose of furnishing interurban transportation facilities, to forego said purpose and engage almost exclusively in municipal and urban business in the city of Cincinnati.”
It is not necessary in the present case to determine what the words “the same terms and conditions applicable to other street railroads” do mean, or whether Section 2505c, Revised Statutes, is applicable, and in view of the state of the art and the importance of these questions to the public and to the street railroad companies, it is inexpedient to do so. No ordinance requiring street railroads in the city generally to exchange transfers, is pleaded, and in the absence of such fact it is sufficient to say that neither Section 2505c, Revised Statutes (91 0.*L., 379), if applicable, nor Section 3443-11, Revised Statutes *215 (91 O. L., 285), makes the power it confers upon urban and interurban street railroad companies to agree as to the use by the latter of so much of the tracks and other property of the former as may be necessary or desirable to enable it to enter or pass through the municipality conditional upon an exchange of transfers.

Judgment reversed and petition dismissed.

Shauck, C. J., Price, Crew and Davis, JJ., concur.